# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **SCALE VIDEO CODING LLC**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | Case No. 4:23-cv-00803-SDJ |
| | ) | |
| **CISCO SYSTEMS INC.**, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## DEFENDANT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    THE ASSERTED PATENT ................................................................................ 1

III.   LEGAL STANDARDS...................................................................................... 3

IV.   ARGUMENT ...................................................................................................... 4

     a.    "[identify/identifying] bandwidth-limited conditions of an internet protocol network between [the/a] video router and a [plurality/set] of video receivers" (Claims 1, 6, 11).............................................................. 4

          1.    The intrinsic record does not provide objective boundaries for the term "bandwidth-limited conditions." ...................................... 5

          2.    SVC's belated definitions of the term "bandwidth-limited conditions" find no support in the specification and do not clarify the meaning or scope of the term. ....................................... 9

          3.    Courts have found similar terms to be indefinite terms of degree............ 12

          4.    SVC's criticisms of Dr. Wenger's opinions have no merit. ...................... 13

     b.    "bandwidth-sufficient conditions" (Claim 11)...................................... 15

     c.    "selectively [forward/forwarding/forwards] one or more of the set of enhancement layers, but fewer than all of the set of enhancement layers, to at least two of the plurality of video receivers through the internet protocol network based upon the identified bandwidth-limited conditions" (Claims 1, 6, 11) ............................................................................................ 16

          1.    The intrinsic record does not define or provide objective boundaries for the "selectively forwarding . . . based upon the identified bandwidth-limited conditions."............................... 17

          2.    Alternatively, if the term is not found indefinite, the Court should adopt Cisco's alternative construction. .................................... 19

     d.    "the video receiver" (Claims 2, 7) ........................................................ 23

     e.    SVC's Complaints Regarding Dr. Wenger's Declaration Are Without Merit....... 26

V.    CONCLUSION................................................................................................. 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alere, Inc. v. Rembrandt Diagnostics, LP,*
    791 F. App'x 173 (Fed. Cir. 2019) ...................................................................20

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.,*
    No. CV 12-2692, 2016 WL 6832623 (D. Minn. Nov. 18, 2016) ....................12, 14

*Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.,*
    709 F.3d 1348 (Fed. Cir. 2013) ...................................................................10

*Bicon, Inc. v. Straumann Co.,*
    441 F.3d 945 (Fed. Cir. 2006) ......................................................................8

*Biosig Instruments, Inc. v. Nautilus, Inc.,*
    783 F.3d 1374 (Fed. Cir. 2015), *cert. denied*, 577 U.S. 1009 (2015) ......................................4

*Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.,*
    785 F. App'x 858 (Fed. Cir. 2019) ...............................................................9, 10

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.,*
    813 F. App'x 522 (Fed. Cir. 2020)..............................................................24, 25, 26

*Chef Am., Inc. v. Lamb-Weston, Inc.,*
    358 F.3d 1371 (Fed. Cir. 2004).....................................................................23

*Datamize, LLC v. Plumtree Software, Inc.,*
    417 F.3d 1342 (Fed. Cir. 2005).....................................................................13

*Digit. Tech. Licensing, LLC v. Cingular Wireless, LLC,*
    No. 2:06-CV-156, 2007 WL 2300792 (E.D. Tex. Aug. 7, 2007)...........................22

*Dow Chem. Co. v. Nova Chems. Corp. (Can.),*
    803 F.3d 620 (Fed. Cir. 2015).......................................................................10

*Enzo Biochem, Inc. v. Applera Corp.,*
    599 F.3d 1325 (Fed. Cir. 2010)......................................................................8

*ePlus, Inc. v. Lawson Software, Inc.,*
    700 F.3d 509 (Fed. Cir. 2012).......................................................................4

*Ernie Ball, Inc. v. Earvana, LLC,*
    502 F. App'x 971 (Fed. Cir. 2013) .................................................................4

*Exmark Mfg. Co. v. Briggs & Stratton Corp.*,
    830 F. App'x 305 (Fed. Cir. 2020) ..................................................................8

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)................................................................10, 11

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014)............................................................4, 8, 13

*IQASR LLC v. Wendt Corp.*,
    825 F. App'x 900 (Fed. Cir. 2020) ....................................................5, 10, 15

*Iridescent Networks, Inc, v. AT&T Mobility, LLC*,
    933 F.3d 1345 (Fed. Cir. 2019)..................................................................21

*Mantissa Corp. v. First Fin. Corp.*,
    No. 2022-1963, 2024 WL 607717 (Fed. Cir. Feb. 14, 2024) ...................3

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ...................................................................................3

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)................................................................1, 3, 5, 13

*Novo Indus., L.P. v. Micro Molds Corp.*,
    350 F.3d 1348 (Fed. Cir. 2003)................................................................23

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008).................................................................3

*Ocean Semiconductor LLC v. Huawei Device USA, Inc.*,
    No. 4:20-CV-00991-ALM, 2022 WL 389916 (E.D. Tex. Feb. 8, 2022)..................3

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005).........................................................10, 25

*Route1 Inc. v. AirWatch LLC*,
    829 F. App'x 957 (Fed. Cir. 2020) .........................................................21

*Sensor Elec. Tech., Inc. v. Bolb, Inc.*,
    No. 18-CV-05194-LHK, 2019 WL 4645338 (N.D. Cal. Sept. 24, 2019)...............17

*Sol IP, LLC v. AT&T Mobility LLC*,
    Case No. 2:18-CV-00526, 2020 WL 60141 (E.D. Tex. Jan. 6, 2020)....................23

*Tech Pharm. Servs. LLC v. Alixa Rx LLC*,
    No. 4:15-CV-766, 2017 WL 3388020 (E.D. Tex. Aug. 3, 2017).............26, 27, 28

*Tech. Props. Ltd. LLC v. Huawei Techs. Co.*,
    849 F.3d 1349 (Fed. Cir. 2017).............................................................................19, 22

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015)...................................................................................10

*Trs. of Columbia Univ. in City of N.Y. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016)...................................................................................16

*U.S. Well Servs., Inc. v. Halliburton Co.*,
    No. 6:21-CV-00367-ADA, 2022 WL 819548 (E.D. Tex., Jan. 17, 2022).............................13

*United Carbon Co. v. Binney & Smith Co.*,
    317 U.S. 228 (1942)......................................................................................................3

*Vstream Techs., LLC v. PLR Holdings, LLC*,
    No. 6:15-CV-974-JRG-JDL, 2016 WL 6211550 (E.D. Tex. Sept. 27, 2016),
    *report and recommendation adopted*, No. 6:15-CV-974-JRG-JDL, 2016 WL
    6159624 (E.D. Tex. Oct. 24, 2016).............................................................................13

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
    853 F.3d 1272 (Fed. Cir. 2017)...................................................................................20

*Wi-LAN USA, Inc. v. Apple Inc.*,
    830 F.3d 1374 (Fed. Cir. 2016)...................................................................................21

**Statutes**

35 U.S.C. § 112.................................................................................................................3

**Other Authorities**

Fed. R. Civ. P. 26.............................................................................................................27

## I.      INTRODUCTION

The parties dispute the indefiniteness of four terms in the '372 patent (1) "[identify/identifying] bandwidth-limited conditions of an internet protocol network between [the/a] video router and a [plurality/set] of video receivers" (claims 1, 6, and 11); (2) "bandwidth-sufficient conditions" (claim 11); (3) "selectively [forward/forwarding/forwards] one or more of the set of enhancement layers, but fewer than all of the set of enhancement layers, to at least two of the plurality of video receivers through the internet protocol network based upon the identified bandwidth-limited conditions" (claims 1, 6, and 11); and (4) the video receiver (claims 2 and 7).[1] The specification offers no guidance as to the scope of these terms, and SVC does not offer any evidence—intrinsic or extrinsic—that compensates for the specification's failures.  Instead, SVC's opening brief and late-disclosed expert declaration[2] only confirm Cisco's positions.  At bottom, because there is no evidence that "inform[s], with reasonable certainty, those skilled in the art about the scope of the invention[,]" the disputed terms should be held indefinite.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

## II.      THE ASSERTED PATENT

The '372 patent, titled "Layered Multicast and Fair Bandwidth Allocation and Packet Prioritization," relates to "a congestion control system that may prioritize designated layers of data within a data stream over other layers of the same data stream" in an overlay multicast network.

---

[1] This brief uses the following abbreviations: U.S. Patent No. 11,019,372 (the "'372 patent") (Dkt. 1-1); Plaintiff Scale Video Coding LLC ("SVC"); Defendant Cisco Systems, Inc. ("Cisco"); SVC's Opening Claim Construction Brief ("SVC Br."); Declaration of Michael Adams in Support of Plaintiff's Opening Claim Construction Brief (Dkt. 22-2) ("Adams Decl."); Declaration of Stephan Wenger, Ph.D. (Dkt. 22-3) ("Wenger Decl.").
[2] Cisco has moved to strike Mr. Adams's untimely declaration because it was provided in violation of the Court's Scheduling Order and the Local Patent Rules, and without seeking leave of Court. *See* Dkt. 23.

'372 patent, Abstract.  SVC has asserted claims 1–2, 6–7, and 11–12, of which claims 1, 6, and 11 are independent.  The asserted claims are all directed to forwarding enhancement layers of a layered video stream to more than one video receiver depending on identified bandwidth-limited conditions of an internet protocol network between a router and a plurality of video receivers. Independent claims 1 and 11 are directed to a "video router" and a "scalable video coding router," respectively, which comprise a processor that executes instructions causing the router to (i) "receive a layered video stream including a base layer and a set of enhancement layers"; (ii) "identify bandwidth-limited conditions of an internet protocol network between the video router and a plurality of video receivers"; (iii) "forward the base layer from the video router to at least two of the plurality of video receivers via the internet protocol network"; and (iv) "selectively forward one or more of the set of enhancement layers, but fewer than all of the set of enhancement layers, to at least two of the plurality of video receivers through the internet protocol network based upon the identified bandwidth-limited conditions." These claims further recite that "each layer of the layered video data stream comprises data packets, each of which is encoded with a sequence number and a layer identifier," and that "the layer identifier for each data packet is based upon a layer to which the packet belongs."   Independent claim 6 is a method claim that recites substantially the same subject matter.   Dependent claims 2 and 12 add the requirement of selectively forwarding enhancement layers based on the "video processing capabilities" of "the video receiver."   Each of these claims contains terms—"bandwidth-limited conditions," "bandwidth-sufficient conditions," and "video receiver," that appear nowhere in the '372 patent specification.

The '372 patent stems from an application (U.S. Patent Appl. No. 15/010,573) filed on January 26, 2016, which claims priority to a provisional application (U.S. Provisional Appl. No.

60/647,601) filed on January 26, 2005.  The disputed terms "bandwidth-limited conditions" and "bandwidth-sufficient conditions" were first introduced to the claims in an August 20, 2020 Amendment, over 15 years after the earliest possible priority date of the '372 patent.  *See* Wenger Decl. at ¶ 48; Decl. of K. Padmanabhan, Ex. 1 (August 20, 2020 Amendment, SVC-Cisco000715–729) at 2, 4-6.  Neither the Amendment nor any subsequent communication between the patent examiner and the applicant discuss or explain the meaning of "bandwidth-limited conditions" or "bandwidth-sufficient conditions."  Wenger Decl. at ¶ 50.

## III.    LEGAL STANDARDS

Claim construction is an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390–91 (1996).  "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

Under 35 U.S.C. § 112, "a patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them' . . . in a manner that avoids '[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims[.]'"  *Nautilus*, 572 U.S. at 909 (quoting *Markman*, 517 U.S. at 373; *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942)); *see also Mantissa Corp. v. First Fin. Corp.*, No. 2022-1963, 2024 WL 607717, at *4 (Fed. Cir. Feb. 14, 2024).  A claim term is indefinite when, considering the intrinsic record, it fails to "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 572 U.S. at 910.  A claim term's indefiniteness renders the claim invalid.  *Id.* at 901.

"[I]ndefiniteness is a question of law and in effect part of claim construction."  *Ocean Semiconductor LLC v. Huawei Device USA, Inc.*, No. 4:20-CV-00991-ALM, 2022 WL 389916, at

*7 (E.D. Tex. Feb. 8, 2022) (citing *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012)).  When a term of degree is used in a claim, "the court must determine whether the patent provides 'some standard for measuring that degree.' " *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015), *cert. denied*, 577 U.S. 1009 (2015) (internal citations omitted).  Similarly, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (internal citations omitted). The specification's standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (internal citations omitted).

## IV.   ARGUMENT

### a.   "[identify/identifying] bandwidth-limited conditions of an internet protocol network between [the/a] video router and a [plurality/set] of video receivers" (Claims 1, 6, 11)

| Cisco's Construction | SVC's Construction |
|---|---|
| Indefinite. | No construction necessary. |

This claim term requires "identify[ing]" when "bandwidth-limited conditions" occur.  But the term "bandwidth-limited conditions" has no ordinary and customary meaning.  Wenger Decl. ¶¶ 36, 59 (explaining that there is no ordinary meaning of "bandwidth-limited conditions" and that no dictionaries or extrinsic evidence reflects a well-known or settled meaning); Decl. of K. Padmanabhan, Ex. 2 ("Wenger Dep. Tr."), at 39:9–19; Adams Decl. ¶¶ 52–95 (offering no opinion on what the ordinary and customary meaning would be and relying on no extrinsic evidence); Decl. of K. Padmanabhan, Ex. 3 ("Adams Dep. Tr."), at 52:25–53:4.  When a claim term has no ordinary

and customary meaning in the art, its definiteness turns on "whether the intrinsic evidence provides objective boundaries." *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 904 (Fed. Cir. 2020) (citation omitted). Here, neither the claims nor the specification provide any standard for determining what constitutes "bandwidth-limited conditions of an internet protocol network." As a result, the '372 patent fails to inform, with reasonable certainty, a person of skill regarding the scope of the claim term "[identify/identifying] bandwidth-limited conditions of an internet protocol network between [the/a] video router and a [plurality/set] of video receivers," and that term should be found indefinite. *See Nautilus*, 572 U.S. at 901.

### 1. The intrinsic record does not provide objective boundaries for the term "bandwidth-limited conditions."

The term "bandwidth-limited conditions" appears twice in each of the independent claims of the '372 patent. In the first instance, the claims recite "identifying ***bandwidth-limited conditions*** of an internet protocol network between the video router and a plurality of video receivers." And in the second instance, the claims recite actions taken upon the identification of "bandwidth-limited conditions"—i.e., "selectively forwarding one or more of the set of enhancement layers, but fewer than all of the set of enhancement layers, to at least two of the plurality of video receivers through the internet protocol network ***based upon the identified bandwidth-limited conditions***." The claims contain no further guidance on "bandwidth-limited conditions" and therefore fail to define, either explicitly or implicitly, the scope of the term "bandwidth-limited conditions."

The specification of the '372 patent fares no better in providing guidance regarding the boundaries of "bandwidth-limited conditions." As an initial point, the term "bandwidth-limited

conditions," and even "bandwidth-limited," is found nowhere in the specification's thirty-four columns of disclosure. Wenger Decl. ¶ 51.

While the specification refers to various concepts related to bandwidth—e.g., "manag[ing] congestion," "manag[ing] the available bandwidth," "measur[ing] the quality of [a] connection," "measur[ing] the quality of its virtual connection," "when congestion occurs," and "bandwidth constraints"—the specification provides no guidance on how congestion in an internet protocol network is determined, or how much congestion would indicate "bandwidth-limited conditions." *Id.* ¶¶ 51–52. And SVC's expert, Mr. Adams, testified that metrics such as congestion, packet loss, delay, and degradation are "***results of***" "bandwidth-limited conditions," not the "bandwidth-limited conditions" themselves." Adams Dep. Tr. at 44:1–14, 48:7–17; *see also id.* at 37:14–20 ("If bandwidth is limited, those potential issues are things that ***may*** happen because of the limited bandwidth."), 69:12–19 (admitting that "there might still be a bandwidth-limited condition in the network," even if there is no packet loss), 70:7–21 (admitting that he does not provide any correlation between delay and "bandwidth-limited conditions").[3] That is, the only items related to bandwidth discussed in the specification are not "bandwidth-limited conditions," and cannot be directly tied to "bandwidth-limited conditions." Nor does the specification provide guidance on how to correlate them to "bandwidth-limited conditions."[4] In the absence of such guidance, the term "bandwidth-related conditions" is indefinite.

---

[3] SVC's reliance on portions of the specification that discuss "bottlenecks" (e.g., SVC Br. at 5 (citing '372 patent at 1:59–60)) is irrelevant for the same reason.

[4] In that same vein, SVC's reliance on "mechanisms" or algorithms provided in the specification related to "congestion control" and "the identification and mitigation of bandwidth constraints" (e.g., SVC Br. at 7 (citing '372 patent at 29:18–49, 4:29–67)) is unhelpful and provides no guidance on "identifying bandwidth-limited conditions."

6

At best, the specification discusses the "outgoing link of a router" that may "have insufficient bandwidth to transmit all pending packets," but provides no explanation for making this determination.  Plus, as Cisco's expert Dr. Wenger explains, "whether an 'outgoing link of a router' has 'insufficient bandwidth' has no bearing on identifying whether a network connecting the router to the video receivers has 'bandwidth-limited conditions.'"  Wenger Decl. ¶¶ 41–53.  In fact, Cisco's expert, Dr. Wenger, explained that during prosecution, the applicant amended the claims of the '372 patent to replace "identifying bandwidth-limited links" with "identifying 'bandwidth-limited conditions of an internet protocol network,'" to overcome prior art.  *Id.* ¶¶ 44-45, 48, 50.  SVC's expert, even after reviewing Dr. Wenger's declaration, failed to address the file history or provide any opinions on this issue.  Adams Decl. ¶¶ 52–95.

And while a person of skill would know that various metrics have some relationship to bandwidth, the specification provides no explanation of how those metrics would be used to "identify bandwidth-limited conditions of an internet protocol network."  Taking packet loss as an example, SVC's expert points to "packet loss" as a "key indicator of bandwidth-limited conditions" in his declaration.  *Id.* ¶ 84.  But during deposition, Mr. Adams testified that the loss of even a single packet on an internet protocol network qualifies as a bandwidth-limited condition.  Adams Dep. Tr. at 37:21–38:14; *see also* SVC Br. at 5–6 ("[I]dentifying bandwidth-limited conditions involves assessing whether the network can support the transmission rate required for multicast ***without encountering congestion and packet loss***[.]").[5]  This position is untenable given the statement in the specification of the '372 patent that "packet loss is unavoidable using the Internet Protocol[.]" '372 patent at 2:14–20.  Either Mr. Adam's view contradicts the specification,

---

[5] All emphases added unless otherwise noted.

or in his view, every internet protocol network would always have "bandwidth-limited conditions," which would render the step of "identifying bandwidth-limited conditions" superfluous and thereby violate basic tenets of claim construction. *See Exmark Mfg. Co. v. Briggs & Stratton Corp.*, 830 F. App'x 305, 310 (Fed. Cir. 2020) (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (explaining that claim terms should not be read to render them meaningless)).

Mr. Adams took similar positions regarding delay, degradation, and corruption. *See* Adams Decl. ¶ 62. Again, not only are these opinions self-contradictory, but they also find no support in the specification. Worse yet, neither SVC nor Mr. Adams points to any objective criteria (e.g., thresholds or ranges) for these metrics that would qualify as a "bandwidth-limited condition." *See, e.g.*, Adams Dep. Tr. at 48:2–17. As such, SVC's attempts to draw parallels between the claims here and the claims found to be definite in *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325 (Fed. Cir. 2010) fail—the patent in *Enzo*, unlike the '372 patent here, was replete with examples as well as numerical ranges of acceptable parameters for discerning the claim scope. *Id.* at 1334–35.

In the end, taking Mr. Adams's opinions and testimony together with the intrinsic record, it is clear that "bandwidth-limited conditions" is a term of degree that improperly "depends on the unpredictable vagaries of any one person's opinion." *Interval Licensing*, 766 F.3d at 1371 (internal quotations and citation omitted). Indeed, when asked how much congestion would constitute a "bandwidth-limited condition," Mr. Adams testified: "That is an answer that is best described as 'it depends.'" Adams Dep. Tr. at 47:8–12. This sort of subjective assessment is exactly what the doctrine of indefiniteness prohibits. *See Interval Licensing*, 766 F.3d at 1370–71(finding term that is "highly subjective" to be indefinite).

8

2. **SVC's belated definitions of the term "bandwidth-limited conditions" find no support in the specification and do not clarify the meaning or scope of the term.**

In a last-ditch effort to avoid an indefiniteness finding, SVC provides—through Mr. Adams's late-disclosed declaration—at least four different proposed constructions for "bandwidth-limited conditions":

(1) "bandwidth-limited conditions imply situations where the network's available bandwidth is restricted or insufficient to transmit the entire layered video data stream to all video receivers without potential issues such as packet loss, delay, or degradation in video quality," Adams Decl. ¶ 62;

(2) "the phrase 'identify bandwidth-limited conditions' refers to the action of recognizing or determining situations where the available bandwidth within the network is restricted or constrained . . . [a] POSITA would understand that bandwidth limitations can occur due to various factors such as network congestion, hardware limitations, or bandwidth allocation policies," *id.* ¶ 63;

(3) "the phrase 'bandwidth-limited conditions' . . . refers to situations where the available bandwidth within a network is constrained, resulting in challenges related to data transmission, such as packet loss, congestion, and the inability to guarantee the delivery of all packets . . . [b]andwidth-limited conditions can occur due to various factors, including network congestion, router crashes, changes in routing policies, or temporary routing loops," *id.* ¶ 90; and

(4) "where there is more traffic than the link can carry," Adams Dep. Tr. at 54:6–55:5, 55:16–20.

These definitions, listed above, are irreconcilably inconsistent and suffer from numerous problems. First, SVC's attempts to define this term run counter to its position that no construction is required. Rather, its varied definitions only confirm that the term "has no ordinary or customary meaning" and that the intrinsic record does not inform a person of skill regarding the boundaries of the term with reasonable certainty. *See Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.*, 785 F. App'x 858, 867 (Fed. Cir. 2019) (even "if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into

meaningfully precise claim scope") (internal citations omitted)); *IQASR LLC*, 825 F. App'x at 907 ("A claim term does not become reasonably certain simply because a skilled artisan, when pressed, managed to articulate a definition for it.").

Second, SVC's expert fails to offer a basis for any of these definitions, which alone is grounds to disregard them.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."); *Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1360 (Fed. Cir. 2013) (holding the district court properly discounted an expert declaration where the expert's conclusory statements were not useful).

Third, the fact that SVC and its expert could not offer one coherent definition of "bandwidth-limited conditions"—despite submitting this declaration six weeks after the deadline set by the Local Patent Rules and the Scheduling Order—only underscores the term's indefiniteness. *Bombardier*, 785 F. App'x at 867 (even "if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope" (internal citation omitted)).  Indeed, if a claim term can have multiple meanings to a person of skill in the art, and the patent does not provide guidance as to which meaning applies, that supports a finding of indefiniteness. *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 631–35 (Fed. Cir. 2015); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341–45 (Fed. Cir. 2015).

Fourth, even looking past these issues, none of SVC's definitions provide objective criteria for "identifying bandwidth-limited conditions."  The mere "fact that [the patent holder] can articulate a definition [even if] supported by the specification . . . does not end the inquiry." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008).  Rather, a person

10

of ordinary skill in the art must be able to "translate the definition[s] into meaningfully precise claim scope." *Id.* Here,  SVC's multiple new definitions, which are themselves unbounded, fail to do so.

SVC's first definition states that "bandwidth-limited conditions ***imply*** situations" where bandwidth is "restricted or insufficient" to transmit data without "***potential issues*** such as packet loss, delay, or degradation in video quality."  This definition does not provide any guidelines for how "bandwidth-limited conditions" can be identified, especially because it requires detecting "potential issues" that have not occurred yet (and only may occur).  But SVC's expert has already negated the usefulness of this definition by testifying that these "potential issues" (packet loss, delay, or degradation) are simply "***results of***" "bandwidth-limited conditions," not the "bandwidth-limited conditions" themselves." Adams Dep. Tr. at 44:1–14, 48:7–17.  At best, this definition suggests that these "potential issues" may also be present if bandwidth-limited conditions presumptively exist, but does not offer a meaningfully precise claim scope for "identifying bandwidth-limited conditions."  Moreover, the definition improperly injects a reference to "the entire layered video data stream," although the "[identify/identifying] bandwidth-limited conditions" limitation in the claims are not so restricted.

SVC's second and third definitions contradict its first new definition.  Unlike the first definition, the second and third definitions are not tied to "the entire layered video data stream." Each of SVC's definitions also lists different factors (network congestion, hardware limitations, or bandwidth allocation policies) that may limit bandwidth, again confirming that there are no objective boundaries by which to "identify bandwidth-limited conditions."  *See, e.g.*, Adams Dep. Tr. at 47:8–12 ("it depends"), 48:2 – 6 (admitting that he does not provide any numerical metrics tying congestion to "bandwidth-limited conditions").

11

SVC's fourth definition, offered by Mr. Adams during his deposition, is untethered from the claim language.  As explained by Dr. Wenger, the applicant distinguished identifying congestion on "links" from "identifying a bandwidth-limited conditions of an internet network." Wenger Decl. ¶¶ 43-44, 47–48.  SVC's expert, even after reviewing Dr. Wenger's declaration, failed to address this.  And as Dr. Wenger explains, assessing the availability of bandwidth on a single link is a much-different exercise from assessing the availability of the bandwidth "of an internet protocol network."  For instance, "[a] POSA[6] would not have understood which of the network connections, or parts of the network, need to be considered in identifying 'bandwidth-limited conditions,'" and "assessing all the links in an environment like the Internet is pretty darn hard because there are so many billions of them."  Wenger Decl. ¶ 57; Wenger Dep. Tr. at 97:6–9. And while Mr. Adams failed to consider the prosecution history, Adam Decl. at ¶¶ 52–95, he does agree that network constraints are different from bandwidth-limited conditions, creating even-greater confusion regarding what it means to "identify[] bandwidth-limited conditions of an internet protocol network."  Adams Dep. Tr. at 75:9–77:1.

Try as it might, SVC's new definitions cannot save the "bandwidth-limited conditions" term from indefiniteness.

### 3.    Courts have found similar terms to be indefinite terms of degree.

Courts have found terms of degree, like "bandwidth-limited condition," to be indefinite. Indeed, courts have found similar terms to be indefinite terms of degrees.  *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, No. CV 12-2692 (JRT/LIB), 2016 WL 6832623, at *17 (D. Minn. Nov. 18, 2016) (finding terms "normal temperature operating conditions" and "low

---

[6] "Person of skill in the art" is often abbreviated as "POSA" or "POSITA."  This abbreviation is used in Dr. Wenger's declaration.

temperature operating conditions" indefinite terms of degree); *Vstream Techs., LLC v. PLR Holdings, LLC*, No. 6:15-CV-974-JRG-JDL, 2016 WL 6211550, at *5–6 (E.D. Tex. Sept. 27, 2016) (opining that terms "sufficiently correct" and "not sufficiently correct" are indefinite terms of degree), *report and recommendation adopted*, No. 6:15-CV-974-JRG-JDL, 2016 WL 6159624 (E.D. Tex. Oct. 24, 2016); *U.S. Well Servs., Inc. v. Halliburton Co.*, No. 6:21-CV-00367-ADA, 2022 WL 819548, at *6 (E.D. Tex., Jan. 17, 2022) (holding that the term "high pressure" is indefinite for lack of intrinsic and extrinsic evidence to provide any "objective baseline" to enable a POSITA to differentiate "high pressure" from non-high pressure).   Terms of degree "when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing*, 766 F.3d at 1371 (citing *Nautilus*, 572 U.S. at 911, 911 n.8).   While "[a]bsolute or mathematical precision is not required," "***some standard*** for measuring the scope of the phrase" "***is not enough***[.]"   *Interval Licensing*, 766 F.3d at 1370–71 (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005)).   As described above, the intrinsic and extrinsic evidence provides a person of ordinary skill in the art with no objective boundaries for the term "bandwidth-limited conditions," and accordingly, that claim term should be found indefinite.

### 4.    SVC's criticisms of Dr. Wenger's opinions have no merit.

Having no actual evidence to support definiteness, SVC resorts to criticizing Dr. Wenger's opinions. But SVC's criticisms are meritless.   For instance, SVC points to the use of "bandwidth-limited" in one of Dr. Wenger's patents (U.S. Patent No. 7,352,809) and the use of "bandwidth-limit" and "bandwidth-limitations" in certain standards specifications he drafted.   SVC Br. at 9. What SVC fails to mention is that none of these references use the disputed term "bandwidth-limited ***conditions***."   And the use of variations of "bandwidth-limited"—as opposed to the disputed

term—is not effective at showing that a person of skill would have understood the disputed term. *See, e.g.*, *Arctic Cat*, 2016 WL 6832623, at *15 (holding that although certain disputed terms appeared in a different patent, they were "ineffective" because they were not used in the same way as in the asserted patent).  Further, Dr. Wenger's patent states that "[t]his invention relates to the transmission of compressed video signals and, more particularly, the optimal determination of a coded bit rate in a system where more than one coded video stream is multiplexed over ***a single, bandwidth limited data link***."  Dkt. 22-5, at 1:9–13.  As Dr. Wenger explained during his deposition, determining whether a single link is "bandwidth limited" has no bearing on "identifying bandwidth-limited conditions of an internet protocol network."  Wenger Dep. Tr. at 79:19–81:5, 96:6–99:13.

SVC also mischaracterizes Dr. Wenger's testimony to suggest that Dr. Wenger admitted that the term "bandwidth-limited conditions" could be "known to a POSITA in the right context." SVC Br. at 9.  Not true.  As SVC itself acknowledges, context is important in interpreting claim language.  *Id.* at 3.  While Dr. Wenger testified that perhaps in some context "bandwidth-limited conditions" may have some meaning, he made clear that in this context, it does not.  *See* Wenger Dep. Tr. at 101:21–102:21 ("If I knew exactly what the bandwidth-limited condition would be, I would be in a much better position to actually give you an answer to that, as I - within the context of this -- this proceeding here, I have really honestly not the faintest idea what 'bandwidth-limited conditions' actually means.  I can't really tell you whether they are --whether they are relevant, you know.  So I would -- I would guess, though, or -- yeah, if – it's certainly possible to write up something where there were definition of bandwidth-limited condition that would involve those factors.  I don't see that being done in this particular patent, but pretty sure it could be done.").

b.       "bandwidth-sufficient conditions" (Claim 11)

| Cisco's Construction | SVC's Construction |
|---|---|
| Indefinite. | No construction necessary. |

The term "bandwidth-sufficient conditions" in claim 11 is indefinite for similar reasons to the term "bandwidth-limited conditions."  Claim 11, in addition to the "identifying bandwidth-limited conditions" term, recites "forwarding all of the set of enhancement layers to at least two of the video receivers in the set of video receivers with *bandwidth-sufficient conditions*."  Like "bandwidth-limited conditions," the term "bandwidth-sufficient conditions" is not used in the specification and SVC does not contend that the term is a term of art.  Its definiteness thus turns on "whether the intrinsic evidence provides objective boundaries." *IQASR LLC,* 825 F. App'x at 904.  The various concepts related to bandwidth in the specification provide no guidance on when there would and would not be "bandwidth-sufficient conditions."  Wenger Decl. ¶¶ 51–52, 83.  And SVC's expert does not help—he simply says that "bandwidth-sufficient conditions" are the opposite of "bandwidth-limited conditions."  Adams Decl. ¶ 146 (opining that "bandwidth-sufficient conditions" refer to when "the network segment between the router and the specified receivers has ample capacity to transmit all enhancement layers of the video stream to those receivers without compromise in quality or performance").  Because neither the claims nor the specification provide any standard for measuring what constitutes "bandwidth-sufficient conditions," the term should be found indefinite.

Compounding the problem, claim 11 requires that the "scalable video coding router forwards all of the set of enhancement layers *to at least two of the video receivers* in the set of video receivers *with bandwidth-sufficient conditions*."  While the remainder of the claim requires

"identifying bandwidth-limited conditions *of an internet protocol network*," this limitation refers to "video receivers."  Yet SVC's expert inexplicably takes the position that "bandwidth-sufficient conditions" of "video receivers" refers to when "***the network segment*** between the router and the specified receivers has ample capacity to transmit all enhancement layers of the video stream to those receivers without compromise in quality or performance."  *Id.*  This definition does not explain how ***video receivers*** have "bandwidth-sufficient conditions."  Wenger Decl. ¶ 82.  And this definition is also inconsistent with the language of the claims, which separately recite the "network" (e.g., claim 1, reciting "internet protocol network") and "video receiver" (e.g., claim 2, reciting "video receiver"), as well as the specification, which only references the network having "sufficient" or "insufficient" bandwidth or capacity.  '372 patent at 1:55–57, 4:33–37, 21:42–45, 31:19–23.  A person of skill is thus left with no guidance on how to make this assessment for a video receiver, which renders the claim indefinite.  *See, e.g.*, *Trs. of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1367 (Fed. Cir. 2016) ("The claims are nonsensical in the way a claim to extracting orange juice from apples would be, and are thus indefinite.").

      c.    **"selectively [forward/forwarding/forwards] one or more of the set of enhancement layers, but fewer than all of the set of enhancement layers, to at least two of the plurality of video receivers through the internet protocol network based upon the identified bandwidth-limited conditions" (Claims 1, 6, 11)**

| Cisco's Construction | SVC's Construction |
|---|---|
| Indefinite.<br><br>Alternatively, if not indefinite, "[select/selecting/selects] using a layer identifier of one or more of the set of enhancement layers and [forward/forwarding/forwards] the one or more of the set of enhancement layers, but fewer than all of the set of enhancement layers, to at least two of the plurality of video receivers through the | No construction necessary. |

| internet protocol network based upon the identified bandwidth-limited conditions" | |
|---|---|

This limitation, which appears in every independent claim, is indefinite for several reasons: (1) the term "bandwidth-limited conditions" is an indefinite term of degree for the reasons discussed in Section IV.A and (2) the requirement of "selectively forwarding . . . based upon the identified bandwidth-limited conditions" compounds the indefiniteness of the claims. Alternatively, to the extent the Court does not find the term to be indefinite, Cisco proposes that the term should be construed to mean "[select/selecting/selects] using a layer identifier of one or more of the set of enhancement layers and [forward/forwarding/forwards] the one or more of the set of enhancement layers, but fewer than all of the set of enhancement layers, to at least two of the plurality of video receivers through the internet protocol network based upon the identified bandwidth-limited conditions."  Cisco's alternative construction finds support in the claim language itself, as well as in the specification.

> 1.     **The intrinsic record does not define or provide objective boundaries for the "selectively forwarding . . . based upon the identified bandwidth-limited conditions."**

The claim requires a decision to "selectively forward[]," upon a determination ("based upon") of "bandwidth-limited conditions."  Because the specification fails to provide objective boundaries for the term "bandwidth-limited conditions," it certainly does not shed light on how to "selectively forward" one or more of the set of enhancement layers "*based upon* the identified bandwidth-limited conditions." This claim term is therefore also indefinite.  *See, e.g.*, *Sensor Elec. Tech., Inc. v. Bolb, Inc.*, No. 18-CV-05194-LHK, 2019 WL 4645338, at *28–30 (N.D. Cal. Sept. 24, 2019) (finding the term "the difference in the molar fractions is selected *based on* a thickness of at least one of the first layer or the second layer" indefinite because "the intrinsic

17

evidence fail[ed] to disclose any criteria for how one might select a thickness of either or both of the layers").

SVC's expert's "interpretation" of the "selectively [forward/forwarding/forwards]" term only confirms its indefiniteness: "A POSITA would understand that selective forwarding of enhancement layers in the context of the video router involves making decisions ***based on various criteria to optimize bandwidth usage and ensure efficient delivery of video content***."  Adams Decl. ¶ 99.  Not only does this fall well short of providing objective boundaries, it is also unsupported by the specification—indeed, Mr. Adams offers no basis for his opinion.  *Id.*  Nor can he, since the specification does not discuss optimizing bandwidth usage—let alone provide any examples of the "various criteria" that might be used for doing so—with respect to selectively forwarding layers.  Wenger Decl. ¶¶ 65–67.

Further, SVC's reliance on portions of the specification that relate to assessments made ***at or by a receiver*** is inapposite.[7]  During prosecution, SVC was steadfast that this functionality was performed ***by the router*** to overcome prior art.  SVC cannot walk that back now to save its claims from indefiniteness.  *See* Decl. of K. Padmanabhan, Ex. 4 (Jan. 25, 2021 Resp., SVC-

---

[7] For example, SVC's brief points to columns 29 and 30 of the '372 patent and alleges that "the specification teaches the following exemplary criteria for the selectively forwarding one or more of the set of enhancement layers, but fewer than all, to video receivers based on identified bandwidth-limited conditions."  SVC Br. at 13.  But this portion of the specification refers to the ***receiver***, not the ***router***, identifying issues pertaining to packet loss and congestion.  *See, e.g.*, '372 patent at 28:63–66 ("By inspecting these sequence numbers each time a packet arrives, ***the receiver*** determines whether it has missed any packets . . . each time a missed packet is detected a counter timer is started for it.  If the packet is received before the time-out expired, the timer is cancelled and removed."), 29:22–26 ("Setting the time-out to a long period . . . increases the time ***for the receiver*** to discover that a layer must be dropped due to bandwidth constraints."), 29:64–67 ("***The receiver*** may keep track of the reception quality of each layer."), 30:54–56 ("If ***the receiver*** currently only has layers 0 and 1 in its reliable-list, it will attempt to repair the hole in layer 1 by sending a retransmission request.").

Cisco000755), at 8–15 (SVC stated that it was "clear that ***the router*** identifies the bandwidth-limited conditions and then ***the router*** selectively transmits less than all of the layers based on the bandwidth-limited conditions identified by ***the router***," and distinguished the cited art because it did not disclose a router performing this functionality); *Tech. Props. Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1358 (Fed. Cir. 2017) (statements made during prosecution to overcome prior art express the patentee's intention to limit the scope of the claim).  Lastly, Mr. Adams's injection of "various criteria" is also contrary to the claim language that expressly requires the "selectively forwarding" decision to be "based upon the identified bandwidth-limited conditions."

Because there are no guidelines in the specification for how to "selectively forward one or more of the set of enhancement layers, but fewer than all of the set of enhancement layers, to at least two of the plurality of video receivers through the internet protocol network based upon the identified bandwidth-limited conditions," the term is indefinite.

### 2.     Alternatively, if the term is not found indefinite, the Court should adopt Cisco's alternative construction.

To the extent the Court does not find the "selectively forwarding" term indefinite, Cisco contends that the term means "***selecting using a layer identifier*** one or more of the set of enhancement layers ***and forwarding*** the one or more of the set of enhancement layers, but fewer than all of the set of enhancement layers, to at least two of the plurality of video receivers through the internet protocol network based upon the identified bandwidth-limited conditions."

Cisco's alternative construction is consistent with the claim language and is supported by both the specification and prosecution history.  The asserted claims recite that "each layer of the layered video data stream comprises data packets, each of which is encoded with a sequence number and ***a layer identifier, and wherein the layer identifier for each data packet is based on***

*a layer to which the packet belongs*."  Thus, the claim language supports Cisco's construction that the "selectively forwarding one or more of the set of enhancement layers" would mean selecting one or more of the set of enhancement layers "using a layer identifier" and forwarding the same. Indeed, this "wherein" clause would be meaningless if it had no bearing on the functions performed by the claimed video router system claims.  *See, e.g.*, *Alere, Inc. v. Rembrandt Diagnostics, LP*, 791 F. App'x 173, 178 (Fed. Cir. 2019) (construing "wherein" clause as "creating a functional limitation for structural relationships of the device"); *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.").

The specification supports this alternative construction.  It does not use the term "selectively forward"; instead, it describes identifying layers to forward using a priority value, which is akin[8] to the claimed "layer identifier," since both indicate which layer the packet belongs to.  *See, e.g.*, '372 patent at 21:38–45 ("To software router daemons, *a priority value of a packet is relative to the stream and becomes relevant when a decision to discard data at a congested router is made*.  *The priority value has no meaning other than as a criterion for discarding packets on congested links*.  When an outgoing link of a router has insufficient bandwidth to transmit all pending packets, it forwards only those packets *with a designated priority or the highest priority*."), 21:53–22: ("knowing that routers *will use the packet priority numbers* when

---

[8] Tellingly, SVC's expert uses the term "layer" and "priority" interchangeably.  *See* Adams Decl. ¶¶ 73 ("[S]ources carefully divide their data packets over *different layers or priorities* in anticipation of routers using packet priority numbers for forwarding selections on congested parts of the network."), 110 ("[T]he system ensures that receivers on congested parts of the network receive the most critical or *highest priority parts* of the data stream."), 112 ("A POSITA would understand that *higher priority layers* may be protected from dropping, ensuring critical data or higher-quality streams are maintained.").

making forwarding selections on congested parts of the network"); *see also id.* at 22:37–41, 22:63–65, 25:5–16.  Thus, the specification's exclusive and consistent description of the selecting and forwarding layers based on priority using layer identifiers supports Cisco's construction.[9]  *See Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1382–84 (Fed. Cir. 2016) (holding that the "specification's consistent descriptions" of the claimed functionality in a certain way "suggest[ed] that the patent's claims do not encompass an embodiment contrary to these descriptions"); *Route1 Inc. v. AirWatch LLC*, 829 F. App'x 957, 961–62 (Fed. Cir. 2020) (holding that the specification limited the meaning of a claim term even where "the specification [did] not contain an explicit statement disclaiming" or "disavow[ing] an embodiment that would otherwise be covered by the plain language of the claim" (internal citations omitted)).[10]

---

[9] SVC argues that the "priority value" alone is not sufficient to identify a layer.  SVC Br. at 17. SVC's assertion is contradicted to the specification, which states that "[t]he priority numbers **represent a logical layer** inside a data stream," and that the "the priority value **has no meaning other than as a criterion for discarding packets** on congested links."  '372 patent at 21:37–45. SVC can only point to irrelevant disclosures pertaining to **receivers**—not routers—to support its assertion.  *Id.* at 25:17–33 ("When the **receiver** detects a missing packet in a layer . . . detecting packet loss is done in a conventional way by sequencing each packet with an incrementing number."), 29:59–67 ("Aside from carrying its own sequence number, each packet contains the current sequence number of all the other layers as well.  By inspecting these sequence numbers each time a packet arrives, **the receiver** determines whether it has missed any packets . . . ."). These disclosures should be disregarded.

[10] Cisco's proposed construction is also supported by the claims of the parent patent, U.S. Patent No. 7,733,868 (the "'868 patent," Decl. of K. Padmanabhan, Ex. 5).  Claim 1 of the '868 patent confirms that a packet's "layer identifier" is equivalent to its "priority value": claim 1 of the '868 patent recites "a layer identifier indicating a relative location of the packet within a hierarchy of virtual layers, the layer identifier further indicating an importance of the packet, wherein the importance of the packet reflects a priority of the packet and influences a probability that the packet is selected to be dropped."  '868 patent at 35:15–22.  And during prosecution of the '868 patent, the applicant admitted that "a layer identifier [included] in each packet . . . show[s] prioritization." Decl. of K. Padmanabhan, Ex. 6 (July 28, 2008 Amend., CISCO-SVC-0006494–518), at 15-16. Indeed, "[s]tatements made during prosecution of a parent application are relevant to construing terms in a patent resulting from a continuation application if such statements relate to the subject matter of the claims being construed."  *Iridescent Networks, Inc, v. AT&T Mobility, LLC*, 933 F.3d 1345, 1350 (Fed. Cir. 2019).

Further, the prosecution history supports Cisco's alternative construction.   SVC distinguished the cited art, U.S. Patent Pub. No. 2004/0071083 ("Li"), solely on the basis that "Li does not disclose 'wherein each layer of the layered video stream comprises data packets, a sequence number and a layer identifier, wherein the layer identifier for each data packet is based upon a layer to which the packet belongs.'"  Ex. 1, at 11–13.  SVC argued that, "***Some scheme*** is required in Li ***to determine which layers get assigned to which channels***, ***and which channels get dropped*** within each channel, but ***the scheme*** **expressly recited in the previously amended claims** is not taught or suggested in Li."  *Id.* at 13.  SVC's representation that the layer-identifier limitation was part of the determination as to which layers get selected by the router is consistent with the specification and supports Cisco's alternative interpretation.  *Tech. Props.*, 849 F.3d at 1358; *see also Digit. Tech. Licensing, LLC v. Cingular Wireless, LLC*, No. 2:06-CV-156, 2007 WL 2300792, at *4 (E.D. Tex. Aug. 7, 2007) ("The terms of a whereby clause must be regarded as ***an essential feature of the invention*** if it is used to distinguish the invention over the prior art during prosecution of the patent.").

SVC asserts that Cisco's alternative construction "overlooks all other criteria" for selecting enhancement layers to forward.  SVC Br. at 16.  But SVC does not identify any embodiments that do not require using the priority number or value for selecting enhancement layers to forward.  For instance, SVC points to the following portion of the specification:

> This technique of encoding an entire stream in different qualities and sending them to clients concurrently to meet their individual bandwidth capacities may be referred to as simulcasting.

'372 patent at 33:15–19.  But this portion is irrelevant here because it describes simulcasting a stream "in different qualities" to account for the "bandwidth capabilities" of receivers, rather than

multicasting by selecting and forwarding to receivers certain enhancement layers based upon "bandwidth-limited conditions of the internet protocol network."

Cisco's proposal simply clarifies the information that is used to "select" an enhancement layer and, contrary to SVC's assertion, does not exclude or overlook other criteria described in the specification for this functionality.  Accordingly, if the Court finds that this limitation is not indefinite, it should adopt Cisco's alternative construction to reduce confusion in the claim language.

### d.    "the video receiver" (Claims 2, 7)

| Cisco's Construction | SVC's Construction |
|---|---|
| Indefinite. | No construction necessary. |

Dependent claims 2 and 7 recite "*the* video receiver."  These claims are indefinite because they lack antecedent basis.  SVC asserts that no construction is necessary, yet argues that the term "refers to *each* of the 'at least two' video receivers that the video router selectively forwards layers to."  SVC Br. at 18–19.  If SVC contends that the use of term "the video receiver" in claims 2 and 7 is an error, its disguised attempt to rewrite the claim is improper.  A Court may correct an error in a patent claim "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims."  *Sol IP, LLC v. AT&T Mobility LLC*, Case No. 2:18-CV-00526, 2020 WL 60141, at *10 (E.D. Tex. Jan. 6, 2020) (quoting *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003)); *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[C]ourts may not redraft claims, whether to make them

operable or to sustain their validity.").  Neither is true here, and without such a correction, claims 2 and 7 should be found indefinite.

There is indeed a reasonable debate as to the correct interpretation of the disputed term. Claims 2 and 7 require "selectively forwarding the one or more of the set of enhancement layers based on video processing capabilities of the video receiver."  There is no prior recitation of "a video receiver" in either claim 2 or claim 7, nor the claims from which they depend (claims 1 and 6, respectively).  Rather, independent claims 1 and 6 recite *three* distinct recitations involving video receivers that have no antecedent relationship to one another—(1) identifying bandwidth-limited conditions of an internet protocol network between the video router and "*a plurality of video receivers*"; (2) "forward[ing] the base layer from the video router to *at least two of the plurality of video receivers*"; (3) "selectively forward[ing] one or more of the set of enhancement layers . . . to *at least two of the plurality of video receivers*."[11]

The claims do not provide reasonable clarity as to which of the prior recitations involving video receivers that "*the* video receiver" in claims 2 and 6 is referring to.  Wenger Decl. ¶ 77; *see, e.g.*, *Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 526–27 (Fed. Cir. 2020) (finding the term "said different IP Address" to be indefinite where there were "three different IP addresses to choose from," leaving a person of skill "to wonder which of the different IP addresses is 'said' different one").  There are numerous reasonable options as to how to interpret what "the video receiver" in claims 2 and 7 is referring to, including:

1. **one of** the "*at least two of the plurality of video receivers*" in the "forwarding" step.
2. **each** of the "*at least two of the plurality of video receivers*" in the "forwarding" step.
3. **one** of the "*at least two of the plurality of video receivers*" in the "selectively forwarding" step.

---

[11] Claim 6 mirrors claim 1 in this way.

4. **each** of the "*at least two of the plurality of video receivers*" in the "selectively forwarding" step.
5. **one of** the "*plurality of video receivers*" in the "identifying bandwidth-limited conditions" step.
6. **each of** the "*plurality of video receivers*" in the "identifying bandwidth-limited conditions" step.

Like *Bushnell*, a POSA is left to wonder which of these interpretations is correct, leaving only the option of finding the claim indefinite.

SVC arbitrarily chooses option 4 from the list above, without explaining why option 4 is the only reasonable choice. *See* SVC Br. at 19. The only reasoning SVC provides is based on a conclusory statement from its expert and a citation to an irrelevant portion of the specification. The conclusory statement is insufficient. *Phillips*, 415 F.3d at 1318. And SVC's citation to '372 patent at 33:15–19, again, does not relate to selectively forwarding enhancement layers. *See* SVC Br. at 20. Further, SVC does not point to anywhere in the prosecution history that supports or mandates its interpretation of the claims.

SVC's interpretation would also cause claims 2 and 7 to be inconsistent with claim 12. Claim 12 requires that the "video router further selectively forwards the one or more of the set of enhancement layers based on video processing capabilities **of each of the set of video receivers**." Claim 11, upon which claim 10 depends, similarly recites "identify[ing] bandwidth-limited conditions of an internet protocol network between the video router and **a set of video receivers**," and "selectively forward[ing] one or more of the set of enhancement layers . . . to **at least two of the remaining video receivers** in the set of video receivers based upon the identified bandwidth-limited conditions." Thus, claim 12 derives its antecedent basis from the "set of video receivers" recited in the "identifying bandwidth-limited conditions" limitation (option 6), and not the "**at least two of the remaining video receivers**," in the "selectively forward" limitation (option 4).

Additionally, SVC's interpretation improperly converts the term "the video receiver"—a singular term—into a plural term.  *See Bushnell Hawthorne*, 813 F. App'x at 526 ("Where, as here, a singular/plural mismatch further confuses an already confused claim, it is proper to consider the mismatch in discerning whether a POSA could understand the claim with reasonable certainty.")

For these reasons, the recitation of "the video receiver" in claims 2 and 7 renders those claims indefinite.

### e.        SVC's Complaints Regarding Dr. Wenger's Declaration Are Without Merit

To distract from the merits of the case, and its own failure to timely serve an expert declaration, SVC attempts to discredit Mr. Wenger's opinions and testimony.  But each of SVC's criticisms of Dr. Wenger falls short.

First, SVC claims that "Defendant's counsel interjected with 'privilege' objections" during Dr. Wenger's deposition.  SVC Br. at 22.  But this is incorrect.  Even a cursory look at the deposition transcript confirms that Cisco's counsel only ever *cautioned* Dr. Wenger not to reveal any privileged information in his answers.  *Id.* at 23; Wenger Dep. Tr. at 30:16–18, 77:6–8, 114:22–24.  The remaining objections were objections to form, not privilege.  SVC Br. at 23; Wenger Dep. Tr. at 22:10–11, 114:20–21.  Thus, at no point did Cisco's counsel instruct Dr. Wenger not to answer questions based on privilege.

The reality is simply that SVC's attorney never followed up after Dr. Wenger responded that his response to certain questions may divulge privileged information.  Rather than accept this, SVC resorts to speculating as to whether Dr. Wenger's opinions are truly his own.  SVC's accusations are completely unfounded.  And of course, the process of drafting an expert declaration necessarily involves exchanges of several drafts between the expert and counsel.  In fact, the rules "contemplate[] some attorney involvement in the preparation of an expert report."  *Tech Pharm.*

26

*Servs. LLC v. Alixa Rx LLC*, No. 4:15-CV-766, 2017 WL 3388020, at *2 (E.D. Tex. Aug. 3, 2017) (citing Fed. R. Civ. P. 26 advisory committee's note (1993)).[12]  "[A]s long as the substance of the opinions is from the expert, the attorney's involvement in the written expression of those opinions does not make them inadmissible." *Id.*  SVC has no basis to state that the substance of the opinions in Dr. Wenger's opinions is not his own.

Ironically, during the deposition of SVC's expert, Mr. Adams, SVC's attorney made the same privilege objections and Mr. Adams gave similar responses.  Adams Dep. Tr. at 12:15–13:10 ("Q. Can you explain how you worked with counsel on this declaration  . . . MR. CHERUVU: I caution the witness not to reveal privileged communications with counsel.  But to the extent you're able to answer the question without divulging communications with counsel, you may answer.").  Mr. Adams then testified that he "collaborated" with SVC's counsel "by exchanging drafts of the document … until it was complete to the satisfaction of both myself and counsel." *Id.*  SVC thus recognizes the need for an expert and counsel to collaborate in some ways.[13]

Second, SVC's argument about Dr. Wenger's use of the phrase "reasonably ascertainable meaning" in the Legal Standards section of his declaration is also meritless.  SVC Br. at 23.  SVC

---

[12] In any event, those who live in glass houses should not throw rocks.  In addition to being late, most of the cited portions of the Adams declaration are either identical or substantially similar to the corresponding portions of SVC's Opening Claim Construction Brief, where they are cited, as explained in Cisco's motion to strike.  *See* Dkt. 23-6 (a table showing identical portions of the Adams Decl. and SVC's Opening Claim Construction Brief).  And Mr. Adams does not even attempt to deny this.  In fact, at deposition, he testified that he did not draft many of the sections of his report.  Adams Dep. at 13:16–18, 22:10–19, 33:10–34:2.

[13] Notably, however, SVC's and Mr. Adams' collaboration went further.  Mr. Adams admitted that he "certainly did not" draft every section of his declaration, and in fact, admitted that SVC's counsel prepared the section relating to his opinions on the "identifying bandwidth-limited conditions" term.  Adams Dep. Tr. at 13:16–18, 33:10–34:2.  It is rather surprising then that SVC takes the position that Dr. Wenger's opinions are not his own when their expert admitted to not drafting the substance of his opinions regarding the first disputed term.

takes issue with the fact that Dr. Wenger could not answer where this legal standard came from, beyond stating that he received legal standards from Cisco's counsel. *Id.*; Wenger Dep. Tr. at 30:4–5.  But Dr. Wenger is not a lawyer, Wenger Decl. ¶ 12, and there is no requirement or expectation that a technical witness identify the provenance of the legal principles that he applies.  Relevant legal standards were provided to Dr. Wenger by Cisco's counsel, and he applied them.  *See Tech Pharm.*, 2017 WL 3388020, at *2.[14]

## V.    CONCLUSION

For all the foregoing reasons, Cisco respectfully requests that the Court adopt Cisco's proposed constructions for the disputed terms.

---

[14] Unsurprisingly, SVC's expert, Mr. Adams, similarly received the legal standard from counsel. Adams Dep. Tr. at 18:7-23.

Date: July 1, 2024

Respectfully submitted,

/s/ *K Padmanabhan*
K. Padmanabhan (*pro hac vice*)
kpadmanabhan@winston.com
Christopher Thomas Gresalfi (*pro hac vice*)
cgresalfi@Winston.com
WINSTON & STRAWN LLP
200 Park Ave.
New York City, NY 10166
Telephone: (212) 294-6700

Saranya Raghavan (*pro hac vice*)
sraghavan@winston.com
Winston & Strawn LLP
35 West Wacker Drive, Suite 4200
Chicago, IL 60601
Telephone: (312) 558-7574

Eric Hugh Findlay
efindlay@findlaycraft.com
Findlay Craft, P.C.
7270 Crosswater Avenue, Suite B
Tyler, TX 75703
Telephone: (903) 534-1100

**ATTORNEYS FOR CISCO SYSTEMS INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV 5(a).  Therefore, this document was served on all counsel who are deemed to have consented to electronic service pursuant to Local Rule CV 5(a)(3)(A).


*/s/ Krishnan Padmanabhan*
Krishnan Padmanabhan